UNITED STATES of America,
Plaintiff–Appellee,

v.

Yves GEFFRARD and Shannon Landry,
Defendants–Appellants.

No. 93–4339.

United States Court of Appeals,
Eleventh Circuit.

July 5, 1996.

Michael G. Smith, Ft. Lauderdale, FL, Dave Lee Brannon, West Palm Beach, FL, for Appellants.

Roberto Martinez, U.S. Attorney, Miami, FL, Kerry S. Baron, West Palm Beach, FL, Suzan H. Ponzoli, Jeane M. Mullenhoff, Linda Collins Hertz, Miami, FL, for Appellee.

Before HATCHETT and ANDERSON, Circuit Judges, and WOOD *, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge:

The two defendants, Geffrard and Landry, were found guilty on various counts of a five-count indictment charging cocaine, firearms and counterfeiting offenses except Landry was acquitted of Count III, the firearm count.[1] Two other defendants similarly charged were tried with defendants, but acquitted on all counts. At sentencing, on the government's motion, the court departed upward.[2]

One issue relates to whether or not the district judge abused his discretion in excusing a juror for just cause after deliberations had begun and the jury had already acquitted the other two defendants on all charges. Thereafter Geffrard and Landry were found guilty by the remaining eleven person jury. Both defendants raise this juror issue, but only Landry questions his sentence. He objects specifically to enhancements for possession of a firearm and for obstruction of justice.

## FACTUAL BACKGROUND

A special agent of the Bureau of Alcohol, Tobacco and Firearms received information from a confidential informant that Landry and Geffrard had a scheme to obtain cocaine from drug dealers by the use of counterfeit United States currency. The Drug Enforcement Agency and the Secret Service were then informed in order to conduct a joint investigation. Geffrard and Landry's plan was to flash the counterfeit bills to drug dealers in order to entice them to produce the cocaine, then Geffrard and Landry would kill the drug dealers, keep their counterfeit bills, and take the cocaine. There was also information that Geffrard and Landry had

---

* Honorable Harlington Wood, Jr., Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. Count I charged a conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846. Count II charged possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2. Count III charged the using and carrying of identified firearms during and in relation to drug trafficking in violation of 21 U.S.C. § 846 and 18 U.S.C. §§ 924(C), 2. Count IV charged an attempt to pass and utter counterfeit United States currency in violation of 18 U.S.C. §§ 472, 2. Count V charged possession of counterfeit United States currency in violation of 18 U.S.C. §§ 472, 2.

2. The sentences imposed are as follows:

Geffrard was sentenced to 210 months imprisonment for Counts I and II to run concurrently, 180 months imprisonment for Counts IV and V to run concurrently with Counts I and II, 60 months imprisonment for Count III to run concurrently with Counts I, II, IV and V, five years supervised release for Counts I and II and three years supervised release for Counts IV and V, all to run concurrently (R3:97). Shannon Landry was sentenced to 235 months imprisonment for Counts I and II, eighteen months imprisonment for Counts IV and V to run concurrently with Counts I and II, five years supervised release for Counts I and II and three years supervised release for Counts IV and V, all to run concurrently.

access to automatic weapons and a bullet-proof vest.

During the joint investigation twelve telephone conversations between Landry, Geffrard, and a confidential informant were monitored and recorded. These conversations reveal that Geffrard and Landry wanted the confidential informant to arrange as part of their scheme for cocaine dealers to produce five to six kilograms of cocaine. Geffrard and Landry would have, they claimed, over $50,000 in counterfeit bills to flash. As it turned out, however, they had to make do with less. They had to pad the counterfeit money to make it look more impressive.

Arrangements were made to follow up this plan with a meeting at a restaurant in Hollywood, Florida, on July 16, 1991, between Geffrard, Landry, the confidential informant, and the supposed drug dealers. Geffrard arrived by car with $6,770 in counterfeit money. He also had with him a loaded and cocked nine millimeter semiautomatic pistol available just behind his driver's seat. Landry arrived in his car, accompanied by the two co-conspirators (both later acquitted), with one in the front, one in the back, one of whom was armed. Then followed a conversation between Geffrard, the confidential informant, and the undercover agents posing as drug dealers with cocaine for sale. During the conversation Geffrard flashed the counterfeit bills he had with him in his car. Then it was all over. Geffrard and Landry were arrested along with the two co-defendants who had been riding with Landry. During the arrest one of the co-defendants tossed a loaded .38 caliber semiautomatic pistol under Landry's car; the gun was retrieved by the arresting agents.

## THE JURY ISSUE

■ This unusual jury question constitutes the most substantial issue.

On the morning of Friday, January 29, 1993, the jury, after being charged and furnished copies of the instructions, retired to begin their deliberations. Later that day the jury submitted two questions, the first was whether the term "possession" applied to Count III, and the second asked for an expla-nation of "entrapment." Up until then entrapment had not been raised or mentioned in the trial and no instruction had been given on the subject. After conferring with counsel, but reaching no agreement, the district judge responded to the jury's first question by referring to a particular part of a given instruction. As to the second question the district judge responded that no explanation would be given about entrapment as entrapment was not an issue in the case. The jury was told it should apply the law given in all the instructions to the facts determined from the evidence. Then the jury was returned to court and dismissed until Monday morning. In a short colloquy between the district judge and the jury it was evident that all was not going well in the jury room. After the jurors were dismissed for the weekend the judge commented to counsel that the jurors were no longer "happy campers," and he was not sure what was going on in the jury room.

On Monday morning the jury reassembled and went back to its deliberations. A short time later the district judge announced he had received another jury note. That note informed the court that the jury now had a verdict for two of the defendants, but not for the other two. This caused differing opinions among counsel as to whether the verdicts on two of the defendants should be received and a mistrial declared as to the remaining two defendants, or whether deliberations should continue as to the remaining two. The district judge opted for the latter under Rule 31(b), Fed.R.Crim.P. which permits a partial verdict. The partial verdict was received and the two co-defendants found not guilty were discharged. The jury was then sent back to deliberate on the remaining two defendants, Geffrard and Landry. After the jury returned to its deliberations the district judge revealed the full extent of jury trouble that had come to his attention in the meantime.

The district judge advised counsel that earlier that morning he had received a letter from one of the jurors raising a new problem, one, as he understandably said, he could do without. After discussing the letter counsel were allowed to read it with the name of the juror excised. After counsel were given op-

portunity to consider the situation, but no agreement being reached among themselves, the district judge dismissed the letter-writing juror on his own motion. The district judge was convinced that that juror would not follow his instructions. The judge offered to give a curative instruction telling the remaining jurors not to speculate on the dismissal of the one juror. Defense counsel, however, declined the district judge's offer. Later that afternoon the eleven-person jury returned guilty verdicts on all counts for Geffrard and on all but one count for Landry. Both defendants moved for mistrials which were denied.

The juror's handwritten five-page letter[3] first identified herself as a person having religious beliefs based on the teachings of Emanuel Swedenborg.[4] A few excerpts from the letter of which the district judge took particular note and other passages from the letter will amply illustrate the problem. The letter opens with this explanation:

> Because of my religious beliefs as a person who believes in Swedenborgianism which is a person who practices the teachings of Emanuel Swedenborg, which are mainly and above all: That real truth and *yes logic* comes from the heart and the soul first and then to the mind, I am afraid that my definition of truth may be different from your definition, and I don't mean to be unkind but to discuss the teachings of Emanuel Swedenborg with the other jurors in relation to this case and how I interpret truth would be like discussing the theory of relativity with my cocker spaniel dog. Deep within my heart and soul I could not live with a verdict of guilty for any of the accused on any of the charges, as I believe deep within my heart and soul and mind that they were unjustly led into this so called transaction by a more intelligent and powerful figure for the soul [sic] purpose of greed. I do not know what you call this but I call this

*intrapment* [sic] [original underlined three times] on the premise that these people were not tracked down on the charges they were accused of but were coheresed [sic] into it, as it was planned from the start by a paid government official and there would be no crime in question if this were not so.

\* \* \* \* \* \*

> I do not know what your opinion of this case is, but mine is that something is horribly wrong with a society that seeks out its victim and finds its strength on preying off of the weakness of that victim.

\* \* \* \* \* \*

> I am not an attorney or judge but neither am I a cheap entertainer who plays follow the bouncing ball. I am an artist and writer who prides her self [sic] on both seeking truth and writing truth through my particular art form which I express my ideals through and the argument against them.

\* \* \* \* \* \*

> I will not be used as another pawn in a scheme to achieve an end that was immoral and dishonest to begin with, because then *I* [original underlined three times] will be the one who is guilty and my sentence will be eternal.

To get the full impact of this letter it should be read in its entirety. The district judge saw in the letter an inability of the juror to follow the court's instructions on the law. The juror could not, she writes, live with a verdict of guilty for any of the defendants on any of the charges because of her beliefs deep within her heart and soul. She labelled the factual circumstances to be entrapment by the government even though the jury had been instructed prior to the letter that entrapment was not an issue in the case. The defense did not raise the issue of entrapment. In addition the rest of the jury is

---

3. A typewritten version of the complete letter is attached as an appendix to this opinion.

4. *Compton's Interactive Encyclopedia* identifies Swedenborg as having been born in Sweden in 1688, dying in 1772. He was a scholar with many talents, but may be most noted for his unique interpretation of Christianity which rejected some of the basic teachings. He had a reputation throughout Europe. His followers founded the Church of the New Jerusalem. There is presently a Swedenborg Foundation in the United States which distributes Swedenborg's many writings and other related materials.

referred to with intellectual contempt as being unable to understand the teachings of Swedenborg.

■ This unusual jury problem is obvious. It arose after jury deliberations had begun and two of the four defendants had already been acquitted. Since counsel could not agree on the best course for the court to follow the judge directed deliberations to continue with the eleven remaining jurors. Those deliberations resulted in guilty verdicts for both defendants except on one count for one defendant. The judge could have declared a mistrial, but double jeopardy possibilities were a factor. The eight-day trial was not long or complicated, so a new trial would not have been as great a burden as in some extended trials. The district judge might have used an alternate to replace the excused juror, if one had been available, but that is generally not a favored procedure after deliberations have begun. *See United States v. Guevara,* 823 F.2d 446, 448 (11th Cir.1987), and *United States v. Kopituk,* 690 F.2d 1289, 1309–11 (11th Cir.1982), *cert. denied,* 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1983).

The district judge used the discretion permitted him under present Rule 23(b), Fed. R.Crim.P., which gives the judge discretion to excuse a juror for just cause and to then proceed to a valid verdict with the remaining eleven jurors. The discretion the rule permits covers this case. The juror, because of religious beliefs at odds with the factual situation and the law applicable to this case, made it plain she could not follow the court's instructions. To the contrary, she stated she had little regard for the other jurors, the judicial system, or a society which she saw as seeking out its victims. The juror did write that she would honor the court's decision as to what she should do about her disagreement with the rest of the jurors, but that has dubious meaning. It does not say that she would apply the judge's instructions to the facts as the jury might determine.

It is further argued that the district judge might have interviewed the juror, but the judge declined with good reason to get into a likely unproductive discussion with a juror about that juror's deeply held religious beliefs at odds with criminal procedure. That was not necessary and it appears from the strong statements in the letter that it would not have been useful. That discourse would surely have led to even more serious defense objections. The complete letter makes it a certainty that this particular juror could not reach a verdict following the judge's instructions as applied to the facts. That juror is fully entitled to her religious beliefs and may espouse them, but in this jury context, where the court's rules—not hers—apply, it cannot be said that the district judge abused his discretion.

No issue is made of the sufficiency of the evidence, and its sufficiency is apparent. The way this novel problem was handled by the district judge results in no miscarriage of justice.

## SENTENCING ISSUES

The district court enhanced Landry's offense level under the Federal Sentencing Guidelines for possession of a firearm, U.S.S.G. § 2D1.1(b)(1), and by an additional two points for obstruction of justice. U.S.S.G. § 3C1.1.

■ In reviewing an imposed sentence under the sentencing guidelines several standards apply. The district court's factual findings are reviewed under a clearly erroneous standard. 18 U.S.C. § 3742(e), *United States v. Scroggins,* 880 F.2d 1204, 1206 n. 5 (11th Cir.1989), *cert. denied,* 494 U.S. 1083, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990). Possession of a firearm for sentencing purposes is a factual finding. *United States v. Louis,* 967 F.2d 1550, 1553 (11th Cir.1992). However, the application of the law to the facts found is reviewed de novo. *United States v. Huppert,* 917 F.2d 507, 510 (11th Cir.1990). The application of the guidelines to the facts, however, is entitled to "due deference." 18 U.S.C. § 3742(e). A finding that the defendant obstructed justice is reviewed under the clearly erroneous standard. *United States v. Cain,* 881 F.2d 980, 982 (11th Cir.1989). Testifying falsely regarding a material fact may constitute obstruction and is likewise reviewed under the clearly erroneous standard. Moreover, such a finding may warrant

the two-level adjustment called for by the guidelines. *United States v. Fu Chin Chung* 931 F.2d 43, 45 (11th Cir.1991).

 Landry and Geffrard were co-conspirators. Geffrard possessed a semiautomatic which was loaded and cocked. Killing the narcotics dealers when the dealers produced the cocaine was a key element of the conspiracy. That was the reason, not just for some eventuality, the gun was possessed at the scene. *United States v. Gates,* 967 F.2d 497, 500 (11th Cir.), *cert. denied,* 506 U.S. 1011, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992), *United States v. Otero,* 890 F.2d 366, 367 (11th Cir. 1989). Violence is very often an ingredient of drug trafficking. The sentencing proof exceeded the necessary standard of preponderance. *United States v. Ignancio Munio,* 909 F.2d 436, 439 (11th Cir.1990), *cert. denied,* 499 U.S. 938, 111 S.Ct. 1393, 113 L.Ed.2d 449 (1991).

Landry was acquitted of carrying a firearm during the conspiracy although one of his passengers carried a loaded semiautomatic which he threw under Landry's car during the arrest. According to Landry he had never met his two passengers previously. They were friends of Geffrard's who were just along for the ride. Nor did Landry, according to him, see that weapon, nor did he see the nine millimeter Browning Geffrard was carrying in his car.

 The denials, poor recollection, and false testimony of Landry in the light of all the credible evidence to the contrary easily justified the perjury findings of the district judge. Landry's testimony, viewed by the district judge as a wilful attempt to obstruct justice during the proceedings, fully justified the two-point offense level increase. Perjury under oath on material matters, not due to confusion or mistake, justifies such an increase. *United States v. Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). Landry claimed as a part of his defense that he believed he was working for the government as an ATF agent. That claim was shown to be transparently false. The government at sentencing set forth numerous examples of false testimony. The district judge could have been more specific in his finding regarding the particular instances of perjury in addition to his rejection of Landry's claim of working for the government during the crime. However, in the context of the whole hearing in which the false testimony was detailed, it was not necessary and would have been redundant. In any event Landry did not request any particular findings of specificity of perjury as found by the district judge. It is too late now to complain in this court.

The judgments as to both defendants are AFFIRMED.

### APPENDIX

Dear Honorable Judge Rudker [sic],

Because of my religious beliefs as a person who believes in Swedenborgianism which is a person who practices the teachings of Emanuel Swedenborg, which are mainly and above all: That real truth and *yes logic* comes from the heart and the soul first and then to the mind, I am afraid that my definition of truth may be different from your definition, and I don't mean to be unkind but to discuss the teachings of Emanuel Swedenborg with the other jurors in relation to this case and how I interpret truth would be like discussing the theory of relativity with my cocker spaniel dog. Deep within my heart and soul I could not live with a verdict of guilty for any of the accused on any of the charges, as I believe deep within my heart and soul and mind that they were unjustly led into this so called transaction by a more intelligent and powerful figure for the soul [sic] purpose of greed. I do not know what you call this but I call this *intrapment* [sic] [original underlined three times] on the premise that these people were not tracked down on the charges they were accused of but were coheresed [sic] into it, as it was planned from the start by a paid government official and there would be no crime in question if this were not so. I am not an attorney or judge but neither am I a cheap entertainer who plays follow the bouncing ball. I am an artist and writer who prides her self [sic] on both seeking truth and writing truth through my particular art form which I express my ideals through and the argument against them.

I do not know what your opinion of this case is, but mine is that something is horribly wrong with a society that seeks out its victim and finds its strength on preying off of the weakness of that victim.

In conclusion under the premise of the questionable moral ethics of the intire [sic] Judicial system involved in this case and pertaining only to this case, I could not find any of the accused guilty on any of the charges, and further more, your Honor, I do not have any kind of personal vendetta toward any branch of government or person in government including yourself, on the contrary I think you are very nice and the prosecuting attorney is very talented with much style. But I am more interested in truth than government or style, because I know that as an artist and human being I can become everything I need to be through truth. But government falls *under* [original underlined twice] truth not truth under government.

I did not ask to be here but I was asked to come supposedly to express my opinion and that is what I am doing. When some one does not respect my opinion, they do not respect me.

I will not be used as another pawn in a scheme to achieve an end that was immoral and dishonest to begin with, because then *I* [original underlined three times] will be the one who is guilty and my sentence will be eternal.

I will honor your decision as to what I should do about my disagreement with the rest of the jurors. The ball is in your hands or may be more appropriately said in your court.

P.S. If you think that one who practices Swedenborgionism is not right in her mind perhaps you also think that Helen Keller, Ralf [sic] Waldo Emerson and William James were not in their right mind. For they also are Swedenborgians, but maybe there [sic] opinions would not be of value either in this court room.