UNITED STATES of America, Appellee,

v.

Louis BURROUS, also known as Male Juvenile, Defendant–Appellant.

Docket No. 96–1301.

United States Court of Appeals, Second Circuit.

June 4, 1998.

Robert J. Boyle, New York City, for Defendant–Appellant.

Timothy Macht, Assistant United States Attorney, Brooklyn, New York (Zachary W. Carter, United States Attorney for the Eastern District of New York Emily Berger, Assistant United States Attorney, Brooklyn, New York, of counsel), for Appellee.

Before: VAN GRAAFEILAND and LEVAL, Circuit Judges, and SQUATRITO, District Judge.[*]

SQUATRITO, District Judge:

Defendant–Appellant Louis Burrous appeals from a judgment of conviction entered on May 8, 1996 in the United States District Court for the Eastern District of New York (Korman, *J.*). A jury found Burrous guilty of conspiring to commit armed robbery within the special territorial jurisdiction of the United States and armed robbery in violation of 18 U.S.C. §§ 371 and 2111, respectively.

Burrous contends on appeal that the district court: (1) erred in not suppressing Burrous' post-arrest statements, which, he alleges, were taken without a knowing and voluntary waiver of his right against self-incrimination and in violation of the Federal Juvenile Delinquency Act, 18 U.S.C. § 5031, *et seq.;* (2) erred in admitting evidence that Burrous threw a box containing cash out a window when the police came to arrest him; and (3) abused its discretion by dismissing a juror with religious objections to jury service without further questioning to determine whether jury deliberations had been tainted.

Finding no error, we affirm the judgment of conviction.

[*] The Honorable Dominic J. Squatrito, of the United States District Court for the District of Connecticut, sitting by designation.

1. Familiarity with facts presented in *United States v. Burrous*, 934 F.Supp. 525 (E.D.N.Y. 1996), is assumed.

2. Another restaurant employee, who was an acquaintance of Burrous', testified that the assailant looked and sounded like Burrous, but failed to positively identify him, apparently fearing re-

**Background** [1]

## A. The Robbery

On the evening of October 12, 1995, two young males entered the back door of a Burger King restaurant located on the Fort Hamilton United States Army Base in Brooklyn, New York. The assailants, wielding a sawed-off shotgun, held the manager at gunpoint and stole $1,073 from the restaurant's safe.

The FBI, working with Military Police and utilizing information provided by a coconspirator to the crime, prepared a photograph lineup including a photograph of Burrous. The restaurant manager identified Burrous, then age sixteen, as the gunman.[2] On October 19, 1995, a federal arrest warrant was issued for Burrous' arrest.

## B. Burrous' Arrest and Questioning

On Friday, October 20, 1995, law enforcement personnel arrived at the second-story Brooklyn apartment Burrous shared with his brother. As FBI agents forcibly entered the apartment, an officer posted outside the apartment saw a hand emerge from the window and drop a black box, which was later found to contain $128 in cash. The government concedes there is no evidence that the discarded money came from the Burger King robbery, eight days previous.

After restraining Burrous, FBI Agent Stephen Shiner told Burrous that there was a federal warrant for his arrest and gave Burrous the first of three statements of his *Miranda* rights. Agent Shiner later testified that he asked Burrous if he understood his rights, and that Burrous nodded his head affirmatively.[3]

prisals from Burrous' friends. *See Burrous*, 934 F.Supp. at 528–29.

3. At all times the conversation took place in English, which Burrous, though a native Spanish speaker, understood and spoke fluently. Burrous has an eighth grade education, although his sister testified at trial that he reads at the second grade level. Burrous also had prior experience with law enforcement, having been arrested a month earlier on unrelated petty larceny and harassment charges.

While still in the apartment building, Agent Shiner asked Burrous where his parents were. Burrous responded that his mother was not home, that his father did not live there, and that he did not know how to contact either of them. Agents then placed Burrous in an FBI car and transported him to a military police facility at Fort Hamilton. In the car, Agent Shiner read Burrous his constitutional rights from an advice of rights card. Shiner testified that Burrous verbally responded "yes" when asked if he understood his rights as they had been explained to him.

At the base, Agent Shiner placed Burrous in an empty room and handcuffed one of Burrous' wrists to the chair in which Burrous was sitting. A second agent was present. Shiner informed Burrous that he had been arrested for taking part in the Burger King robbery, and again asked Burrous how his parents or guardian could be contacted, to no avail. He then interrogated Burrous for twenty to thirty minutes. First, Shiner asked Burrous if he could read and write English. Burrous responded affirmatively. Agent Shiner then read aloud the advice of rights form with its accompanying waiver of rights, while pointing to the words as he read them to enable Burrous to follow along. Burrous signed the waiver of rights form less than an hour after police arrived at his apartment building to arrest him.

Agent Shiner then conducted what the government refers to as a "personal history" interrogation. For at least the third time, Burrous was asked about his parents' whereabouts, and answered that his mother lived in California, his father somewhere in Manhattan. He said he did not know precisely where his father lived or how either his father or mother could be contacted. Burrous indicated that his brother was his guardian, but that there was no way to reach him at work at "the airport." In fact, Burrous' brother, a Delta Airlines employee at John F. Kennedy Airport, did not work on Fridays, had been with Burrous that morning, and was out paying a utility bill and buying food when Burrous was arrested. Despite repeated inquiries, Burrous did not give the agents information sufficient to enable them to contact these or any of his other relatives, nor did Burrous ask to use the telephone to attempt to contact anyone himself.

Burrous was apparently attempting to keep police from contacting family members. At a subsequent hearing, Burrous' sister, who lives in Manhattan, testified that Burrous knew her address and phone number, but might not have wanted to contact her because they were not on "good terms" at the time. Burrous' brother also testified that Burrous, after claiming that he did not know how to reach his brother, contacted him later in the day by calling a neighbor.

The government eventually focused its questioning on the Burger King robbery. Burrous consistently maintained his innocence, stating that he had not been to Fort Hamilton in two years. Burrous was arraigned in federal district court that same afternoon. On April 2, 1996, Burrous elected in writing to be tried as an adult pursuant to 18 U.S.C. § 5032.

## C. Trial Proceedings

Burrous moved the district court to suppress his pretrial statements, arguing that they were taken in the absence of a knowing and voluntary waiver of his right against self-incrimination and in violation of his rights under the Juvenile Delinquency Act, 18 U.S.C. § 5033 ("section 5033"), which requires police, inter alia, to immediately notify a parent or guardian of the arrest of a juvenile. The motion was referred to United States Magistrate Judge Joan M. Azrack, who, after an evidentiary hearing, recommended denial of the motion. Judge Azrack opined that the Juvenile Delinquency Act requires only that law enforcement personnel make reasonable efforts to notify a parent or guardian, and held that the government had taken such efforts in this case. Moreover, Judge Azrack expressed the view that even if the agents had violated the Act, such a violation would not require suppression of Burrous' voluntarily-made statements. Finally, Judge Azrack found that Burrous' waiver of his rights was knowing and voluntary, rendering his post-arrest statements admissible.

The district court adopted Judge Azrack's recommendation, denying Burrous' motion to

suppress. The court also denied Burrous' motion *in limine* to preclude evidence of the box of cash ejected from the window, finding that the act was relevant because a jury could infer from it, among other things, consciousness of guilt.

During the ensuing two-and-one-half-day trial, the government presented testimony, *inter alia,* that Burrous had visited the base shortly before the robbery. This testimony contradicted the statement Burrous made, while in police custody, that he had not been on the base for at least two years.

The jury began deliberating on April 17, 1996. After several hours of deliberations, the jury foreperson sent a note to the court stating that the jury could not reach a verdict because one of the jurors had a "religious conviction." The judge brought the jury into court, and posed the following question:

> [I]s there any reason, religious or otherwise why [any of] you could not listen to the evidence, follow my instructions as to the law and render a fair and impartial verdict?

One juror raised her hand. The court then questioned her outside the presence of the other jurors. The juror stated that before beginning deliberations she had not read the section in the juror's handbook concerning the juror's oath. She was unable to continue deliberating because, she said, "[a]ccording to the Bible, I'm not supposed to judge and I feel that's what I'm doing, judging." She said that had she read the oath she would have told the court of her objection during jury selection and asked to be excused earlier.

Pursuant to Federal Rule of Criminal Procedure 23(b), the district court excused the juror. Burrous moved for a mistrial contending that: (1) given the brevity of the trial, it was inappropriate to have a verdict rendered by a jury of less than twelve; and (2) because

the juror had not informed the court of her religious objection prior to the deliberations, it was possible that her objection concerned the deliberations. Alternatively, Burrous argued that the court should ask the remaining jurors if they were affected by what had occurred. The court denied Burrous' requests, dismissed the juror with the religious objection, and sent the remaining jurors to finish deliberating. Shortly thereafter, the jury returned a verdict of guilty on both counts.

Burrous was sentenced to seventy months' imprisonment, which he is currently serving, to be followed by three years' supervised release, and was ordered to pay a special assessment of $100.

### Discussion

#### A. *Admissibility of Post–Arrest Statement*

Burrous attributes error to the district court's admission of his post-arrest statements to police, arguing that the statements were taken in violation of the parental notification requirements of the Federal Juvenile Delinquency Act, and that, in any event, his signed waiver was not knowing and voluntary.

#### 1. *The Parental Notification Requirement.*

■ Burrous first argues that the parental notification requirement of section 5033 [4] is mandatory, and that the failure of federal law enforcement personnel to notify his parents or guardian of his arrest requires suppression of his post-arrest statements. The government contends that, even if successful notification is not accomplished, statements taken incident to the arrest should not be suppressed if the arresting agents first made reasonable efforts at parental notification.

---

4. This section reads:

Whenever a juvenile is taken into custody for an alleged act of juvenile delinquency, the arresting officer shall immediately advise such juvenile of his legal rights, in language comprehensible to a juvenile, and shall immediately notify the Attorney General and the juvenile's parents, guardian, or custodian of such custody. The arresting offi-

cer shall also notify the parents, guardian, or custodian of the rights of the juvenile and of the nature of the alleged offense.

The juvenile shall be taken before a magistrate forthwith. In no event shall the juvenile be detained for longer than a reasonable period of time before being brought before a magistrate. 18 U.S.C. § 5033.

The government notes that the agents made numerous efforts to obtain contact information, but to no avail, and that Burrous' lack of cooperation hindered their notification effort.

In support, the government cites the Ninth Circuit's dictum in *United States v. Doe*, 862 F.2d 776, 779–80 (9th Cir.1988). That case involved the inculpatory statements of a detained alien juvenile whose parents apparently resided in Mexico. The government had made no effort to contact either the detainee's parents or the Mexican consulate. The government's failure either to make an effort to notify or to show why notification would not have been feasible was held to constitute a violation of the statute requiring suppression of the juvenile's statements. In so holding, however, the *Doe* court took the view that section 5033 would be satisfied by reasonable efforts at notification. *Id.* at 779.

The structure of section 5033 reinforces the government's argument. The statute requires not only "immediate" parental notification, but also that the detained juvenile be taken before a magistrate "forthwith." 18 U.S.C. § 5033. Read literally, these requirements could conflict. The delay incurred in accomplishing parental notification, which might be considerable, might prevent realization of the "forthwith" arraignment. Notwithstanding its categorical terms, we do not read the statute as requiring the government to chose between violating one of the two potentially incompatible requirements, or as requiring the government to forego questioning of the detained suspect if it is unable after reasonable efforts to notify the parents. *See United States v. Smith*, 574 F.2d 707, 710–12 (2d Cir.1978), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978)(where literal reading of juvenile statute would have led to anomalous result, court chose "construction which best serve[d] the intended purpose of the statute.").

In view of this tension, we decline to decide whether, and if so, when, a failure to notify may give rise to a suppression remedy under section 5033. We hold only that Burrous' statements, taken after a repeated and fruitless good faith inquiry designed to locate the detained juvenile's parents, were admissible in evidence. We therefore conclude that the district court did not err in denying the defendant's motion to suppress his statements.

### 2. *Validity of Waiver*

▉ As an alternative to his section 5033 argument, Burrous contends that he did not knowingly and intelligently waive his Fifth Amendment right against self-incrimination. This court "will affirm a district court's conclusion that a defendant knowingly and voluntarily waived his constitutional rights if any reasonable view of the evidence supports it." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir.1993), *cert. denied*, 510 U.S. 923, 114 S.Ct. 323, 126 L.Ed.2d 269 (1993) (internal quotation marks and citation omitted). In the case of interrogation of a juvenile, we examine the totality of the circumstances culminating in the waiver. *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). This approach requires an

> inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Id* (citation omitted).

▉ Based upon a review of the record, this court holds that the district court did not err in finding that Burrous knowingly and voluntarily waived his Fifth Amendment rights. Burrous was sixteen years of age at the time of the arrest and had been arrested approximately one month earlier on similar charges. Though not well-educated, Burrous is fluent in spoken English. Agent Shiner read Burrous his rights in their entirety at least twice. Burrous indicated he understood them, and witnessing officers testified that he appeared to comprehend what was being read to him. Burrous thereafter signed a written waiver of his rights, less than an hour after police arrived at his apartment just prior to his arrest. Though he waived his rights against self-incrimination, Burrous consistently maintained his innocence. Given the complete absence of evi-

dence of coercion or compulsion, we hold that Burrous' waiver was both knowing and voluntary, rendering his subsequent statements admissible in his criminal trial. *See Fare,* 442 U.S. at 726–27, 99 S.Ct. 2560 (upholding validity of waiver by 16–year–old suspect who had experience with police, was of sufficient intelligence to understand rights and consequences of waiver, and had not been "worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit."). We accordingly find no error in the district court's admission of Burrous' statement to police.

## B. *Admissibility of Evidence Regarding Disposal of Money*

■ Burrous also challenges the district court's admission of evidence that he tossed a box containing $128 in cash from the window of his apartment while law enforcement personnel were in the process of arresting him.

■ A decision by a trial court regarding the relevance of proffered evidence will be upheld unless shown to be an abuse of discretion. *United States v. Cruz,* 797 F.2d 90, 98–99 (2d Cir.1986). The district court held that evidence of the disposal of the cash box was relevant because a jury could infer consciousness of guilt or that the money was stolen from the act of throwing money out the window. The court further noted that Burrous was free to argue before the jury that the evidence was not probative on the issue of whether he had perpetrated the Burger King robbery. Such holdings are clearly within the sound discretion of the trial court, and finding no abuse of that discretion, we affirm the district court's holding on this issue without further discussion.

## C. *Juror Dismissal*

Finally, Burrous contends that the trial court erred by summarily removing the juror with religious objections and sending the jury back to deliberate without assessing the extent to which the deliberations might have been tainted by the dismissal.

5. To avoid such problems, including the possibility of a hung jury, district judges often ask during jury selection whether any juror has religious

■ The district court may remove, for just cause, a juror who indicates during deliberation that he is unable to render a verdict because of a personal religious objection, *see United States v. Geffrard,* 87 F.3d 448, 451–52 (11th Cir.), *cert. denied,* —— U.S.——, 117 S.Ct. 442, 136 L.Ed.2d 339 (1996), unless it appears that the purported objection might mask a disagreement among jurors regarding the merits of the case, *see United States v. Hernandez,* 862 F.2d 17, 23 (2d Cir.1988), *cert. denied sub nom. Quinones v. United States,* 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989). Where the dismissal does not unduly taint the proceedings, the remaining eleven jurors may proceed to render verdict. *See United States v. Stratton,* 779 F.2d 820, 830–34 (2d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986). These decisions are entrusted to the discretion of the trial court, *see* Fed.R.Crim.P. 23(b), and will only be reversed in cases where that discretion is abused. *See Geffrard,* 87 F.3d at 452; *United ed States v. Ruggiero,* 928 F.2d 1289, 1300–02 (2d Cir.), *cert. denied sub nom. Gotti v. United States,* 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991).

■ Burrous first argues that the district court should have made a detailed inquiry of the dismissed juror to determine whether, in fact, she had a religious objection, or did not want to continue deliberating for some other reason. Burrous correctly points out that during jury selection, the dismissed juror did not respond when asked if there was anything that would make her unable to render a verdict. He gives us no reason, however, to disbelieve her explanation for the delay in discovering her objection.

A review of the record indicates that the jury-empaneling court never specifically asked the jurors whether they might have religious objections to passing judgment on a defendant in a criminal trial.[5] Indeed, the juror indicated that she would have spoken up earlier had such a question been presented or had she read the jury's oath and understood that the oath required her to pass judgment on another. There is nothing in the record to suggest that the juror was less

beliefs that could prevent the juror from rendering a verdict based on the evidence.

than candid with the court in this regard. Because we can say with confidence that the juror was unable to continue deliberating for purely personal reasons and not due to her opinion on the merits of the case, we hold that the district court did not err in dismissing the juror and refusing to declare a mistrial. *See Stratton,* 779 F.2d at 832.

 Nor did the court abuse its discretion by sending the remaining jurors back to deliberate without further questioning them further, in order to determine whether the deliberations had been tainted by the events surrounding the dismissal. There is no reason to believe that the fairness of other jurors had been tainted in any way. We hold that the court did not err in refusing to order a new trial or in ordering the remaining jurors to continue deliberating under these circumstances. *See Ruggiero,* 928 F.2d at 1300–02 (holding that court did not err in refusing to question jurors regarding dismissal before ordering them to resume deliberations).

### Conclusion

We have considered all of Burrous' arguments and find them to be without merit. The judgment of the district court is affirmed.